## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KELI E. HARGROVE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. CIV-04-1408-F** |
| | ) | |
| **MILLICENT NEWTON-EMBRY,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner appearing pro se, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B) and (C). Respondent has filed a response to the petition.  Petitioner did not file a reply within the time limits prescribed by this Court.  Thus, the matter is at issue.  For the reasons set forth below, it is recommended that the petition be denied.

Petitioner is challenging her conviction of first degree malice aforethought murder for which she was sentenced to life imprisonment without the possibility of parole.[1] District Court of Oklahoma County, Case No. CF-99-2697.  Petitioner filed a direct appeal, and in a twenty-two page unpublished opinion, the OCCA affirmed Petitioner's judgment and conviction.  Relevant State Court Record ("Record"), Ex. 3.  Petitioner states that she has filed no applications for post-conviction relief.  Petition at 5.

---

[1]The State filed a bill of particulars seeking the death penalty, but the judge sentenced Petitioner to life without the possibility of parole in accordance with the jury's recommendation.

## Factual Background

The relevant facts underlying Petitioner's conviction, summarized from the OCCA's opinion affirming Petitioner's conviction and sentence, are helpful in understanding Petitioner's grounds for habeas relief, which follow. *See* Record, Ex. 3. On February 23, 1999, the body of twenty-one-year-old Christina ("Tina") Hargrove, Petitioner's mentally retarded stepdaughter, was found in a ditch by the side of the road in Pottawatomie County. She was hogtied in a fetal position with a nylon rope that went around her neck and down and up her body, and her body had been placed inside a black plastic trash bag and partially burned. According to the medical examiner, the body had sustained defensive wounds to the left hand and lacerations and other injuries caused by crushing or blunt force to several parts of Tina's head, including the upper lip, right cheek, left eye, chin and forehead. The left side of the jawbone was fractured, and several teeth on the left side had been "fractured out of socket." The body also had contusions from blunt force near the right knee and leg, a fracture of the fibula of the right leg and bruising in the shoulder and arm. The body was not identified until approximately two months after it was found.

Christina Fann, the twelve-year-old daughter of Petitioner's friend Pam Cheek, testified that she overheard Petitioner talking with Petitioner's son, Christopher Cooper, about murder. Fann testified that Petitioner later told her that she had hit Tina in the head with a sledgehammer when the girl walked in on her while she was doing drugs. Fann testified that Petitioner said Tina lay on the floor until she died after which Petitioner tied her up, put her in a trash bag and burned her. Fann repeated this story to

her sister, who told a friend, who in turn placed an anonymous call to the police and related the story about Tina.

Shirley Fennell, who was incarcerated in the county jail at the same time as Petitioner, testified that Petitioner talked with Fennell about the crime with which she was charged.   Fennell testified that Petitioner told her that she had killed her stepdaughter in a frenzied beating, possibly with a fence post, and that after the beating, Petitioner waited until Tina stopped breathing, placed her body in a trash bag, and the following day she disposed of the body and set it on fire with the help of her husband.

Petitioner's husband, Charles Hargrove, testified at trial and admitted that he had plead guilty to the crime of accessory to murder for his role in disposing of Tina's body and/or covering up the crime.  Although he had difficulty remembering the facts of the case, he did remember Petitioner and Tina arguing with each other.  He also testified that Petitioner told him Tina had run away with a carnival worker, that Petitioner had him take out garbage bags to her car that same day, that one of the bags was heavier than the others, and that he had suspected Petitioner had done something to Tina.

Petitioner's son, Bobby Cooper, testified that on the same day Petitioner told him Tina had run away with a carnival worker, he observed Petitioner sitting on the bed with a bloody rag against her head.   Additionally, the preliminary hearing testimony of Petitioner's son Christopher was read into the record which testimony confirmed that Petitioner and Tina were fighting on the day in question, that Tina hit Petitioner in the head with a plate, that Tina returned to the house with a long object, and that Petitioner took it away and struck Tina in the head twice.  According to Christopher, he and his

brother Bobby stopped the fight and Tina went into a bedroom, and he never saw Tina again.

## Petitioner's Habeas Claims

As grounds for relief, Petitioner sets forth verbatim the ten claims she raised on direct appeal:

1.   The trial court committed reversible error by allowing the state to introduce, in the first stage of trial, evidence of other crimes and bad acts which had nothing to do with the offense in question.  By admitting the other crimes evidence, the trial court violated Petitioner's rights under the Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7 and 9 of Oklahoma Constitution.

2.   The introduction of irrelevant but highly prejudicial photographs in Petitioner's trial deprived her of a fair trial and reliable sentencing proceedings in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution.

3.   The trial court committed reversible error by permitting the prosecution to introduce evidence of positive Luminol blood tests when the subsequent confirmatory tests failed to corroborate the presence of blood, under these circumstances, the positive Luminol tests were irrelevant, misleading and highly prejudicial.

4.   The introduction of the opinions of Agents Lahue and Collins that the informant, Shirley Fennell, was providing truthful and sincere testimony violated the Petitioner's right under the Fourteenth, Sixth, and Eighth Amendments of the United States Constitution and Article II, §§ 7, 9, 19 and 20 of the Oklahoma Constitution.

5.   Petitioner's conviction must be reversed because of the State's introduction of certain pretrial unsworn statements of its own witnesses.  Such evidence constituted inadmissible hearsay and violated Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Article II, §§ 7, 9 and 90 of the Oklahoma Constitution.

6.   The trial court committed reversible error when it allowed the prosecution to introduce Petitioner's statements to the police on April 28,

1999, because at the time Petitioner was in police custody and had not been advised of, or waived, her constitutional rights.  It follows that the admission of these statements and the fruits thereof violated Petitioner's rights under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution.

7.  The trial court committed reversible error by refusing to allow defense witness Linda Bidwell to testify regarding statements made by Shirley Fennell, the jail house informant, suggesting that Fennell was to receive a deal from the state that was better than the one Fennell described on the witness stand.  Precluding the defense from calling Bidwell violated Petitioner's right under the Sixth and Fourteenth Amendments of the United States Constitution and under Article II, §§ 7 and 20 of the Oklahoma Constitution.

8.  The trial court's refusal to instruct the jury on the range of punishment for First Degree Manslaughter prior to jury deliberations in the first stage of the trial violated due process.

9.  The trial court violated due process when it refused to instruct the jury on the defense of voluntary intoxication in the face of evidence that the defendant was intoxicated at the time of the offense.  Accordingly, Petitioner's conviction is in contravention of the Fourteenth Amendment of the United States Constitution and Article II, § 7 of the Oklahoma Constitution.

10.  The accumulation of error in this case deprived Petitioner of due process of law and necessitates reversal pursuant to the Fourteenth Amendment of the United States Constitution and Article II, § 7 of the Oklahoma Constitution.

Petition at 2-3.

## Discussion

## Standard Governing Petitions For Habeas Corpus

As a preliminary matter, the undersigned notes that as grounds for federal habeas relief, Petitioner has listed the ten propositions of error verbatim as raised on direct appeal without any facts or arguments to support each claim.  She merely states that she "incorporate[s] the Brief in Chief filed on direct appeal" and "supports the above

propositions of error with arguments and authorities set out therein." Petition at 3-4.[2] Petitioner's only attempt to support her habeas claims is to "direct the Court to the dissenting opinion" of one of the OCCA judges, stating that the OCCA decision is "an objectively unreasonable application" of *Brecht v. Abrahamson,* 507 U.S. 619 (1993), as to the cumulative errors in her trial.  Petition at 4-5.

To the extent Petitioner merely adopts the claims asserted in her state court appeal which are based largely on alleged trial errors involving state law she misinterprets the scope of the federal habeas remedy.  A federal habeas petition is not simply another appeal from a state court conviction.  In this regard, the Supreme Court has held that "[f]ederal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."  *Smith v. Phillips,* 455 U.S.209, 221 (1982).  The federal writ of habeas corpus reaches only convictions obtained in violation of the United States Constitution, laws, or treaties.  *See e.g., Mabry v. Johnson,* 467 U.S. 504, 507 (1984); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *Brinlee v. Crisp,* 608 F.2d 839 F.2d 839, 843 (10th Cir. 1979).  Thus, Petitioner's reliance on state law or the Oklahoma Constitution to support the claims in her petition cannot serve as a basis for federal habeas relief.  *See Estelle v. McGuire,* 502 U. S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Davis v. Reynolds,* 890 F.2d 1105, 1109 n. 3 (10th Cir. 1989) ("Alternative state claims, whether grounded in state statutes or the State Constitution, are not cognizable under 28 U.S.C. § 2254(a).").

---

[2]A copy of Petitioner's supporting brief on appeal is attached to the petition. Petition, attached "Brief of Appellant" in Case No. F-2001-1494.

Here, Petitioner's claims were raised on direct appeal and rejected by the OCCA in an unpublished opinion that contained a short discussion of each claim. For factual and legal matters that have been adjudicated in state court, this Court may grant a writ of habeas corpus relief only if that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1) and (2). A state court's decision is contrary to clearly established federal law where it applies a rule that contradicts the law set forth in Supreme Court cases, or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The "state court decision is not 'contrary to . . . clearly established Federal law' simply because the court did not cite [Supreme Court] opinions." *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003)(per curiam ). "[A] state court need not even be aware of [Supreme Court] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Id.* (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*)).

A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court "applies [the Supreme] Court's precedents to the facts in an objectively unreasonable manner." *Brown v. Payton*, 544 U.S. 133, 125 S.Ct. 1432, 1439 (2005); *Williams v. Taylor*, 529 U.S. at 407. With respect to the "unreasonable application" requirement, "it is the habeas applicant's burden to show that the state court

7

applied [the Supreme Court case] to the facts of his case in an objectively unreasonable manner," not merely that the state court decision applied the Supreme Court case incorrectly. *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (*per curiam* ). Further, a state prisoner seeking habeas relief based on alleged erroneous factual determinations must overcome by clear and convincing evidence the presumption of correctness afforded state court factual findings. *See* 28 U.S.C. § 2254(e)(1); *Smith v. Mullin*, 379 F.3d 919, 924-25 (10th Cir. 2004).

## Ground One - Admission of Other Crimes Evidence

In Ground One, Petitioner re-asserts the first claim raised in her state court appeal in which she alleged that the trial court's admission of other crimes and bad acts violated her rights under the Oklahoma Evidence Code, the Oklahoma Constitution and the Eighth and Fourteenth Amendments of the United States Constitution.  In her direct appeal brief Petitioner contended that during the first stage of the trial, the State filled the record with evidence of numerous bad acts attributed to her, many of which occurred years before the homicide.  Petition, attached Brief of Appellant at 16.  Petitioner alleged on appeal that these instances included (a) acts of abuse against Tina and Petitioner's husband; (b) excessive use of alcohol and drugs; and (c) and acts of personal dishonesty, for example, misappropriating disability checks sent for Tina's care and stealing a physician's prescription pad for obtaining diet pills. *Id.* at 17-20.  Petitioner argued that none of the challenged evidence was admissible under the Oklahoma Evidence Code. *Id.* at 17.  Petitioner further argued that  the other crimes evidence was irrelevant and prejudicial and its admission violated her rights under the Eighth and Fourteenth

Amendments because the only real fact issues in the case were whether she intended to kill Tina or whether the homicide was the result of heat of passion or mutual combat, a lesser crime. *Id.* at 20-25.

In considering Petitioner's claims of improperly admitted other crimes evidence,[3] the OCCA agreed that the predominant issue in the case was one of intent – whether Petitioner intended, with malice aforethought, to kill Tina or whether a lesser form of homicide had been committed. With this issue in mind, the OCCA examined the State's theory of the case – "that [Petitioner] thoroughly hated her stepdaughter and treated her as a Cinderella-like slave." Record, Ex. 3 at 7.[4] The Court also noted the State's theory "that this was an escalating situation of abuse, fueled by the family's poverty, [Petitioner's] drug and alcohol abuse, crowded living conditions, an unhappy marriage, and the difficulties of caring and providing for a mentally handicapped child." *Id.* The Court pointed out that the State "argued that, over the years – as Tina grew older (and possibly more independent) and [Petitioner] grew angrier and more dependent on drugs

---

[3]The OCCA listed the following other crimes and bad acts challenged by Petitioner:

physical beatings of Tina; breaking Tina's arm and not seeking proper medical care; making Tina stand on her head upside down and naked as punishment; treating Tina as a slave; forcing Tina to sleep in the closet or garage; forcing Tina to lick the toilet bowl; not properly feeding Tina; calling Tina "retarded bitch," "cunt," and "slobberbox;" breaking her husband's arm with a baseball bat; abusing her husband in various ways; extensive drug and alcohol abuse; stealing a doctor's prescription pad for diet pills; stealing Tina's disability checks and using the money for herself; and treating Tina differently than the other children by dress and care.

Record, Ex. 3 at 6. The OCCA characterized this list as "fairly conservative" and described the trial record as "filled with additional actions that could fairly be grouped under the terms 'other crimes, wrongs, or acts.'" *Id.* at n.3.

[4]The OCCA noted that prior to trial the State filed two extensive notices of its intent to introduce testimony concerning Petitioner's physical and verbal abuse of Tina, totaling approximately 44 pages pursuant to *Burks v. State*, 594 P.2d 7 (Okla. Crim. App. 1979), Record, Ex. 3 at 7.

9

and alcohol – [Petitioner's] treatment of Tina worsened" and "[t]he result was an explosion of hateful emotions that had been percolating for years." *Id.* at 7-8. The Court found that the State's theory "brought other crimes and bad acts to the forefront, as the deteriorating condition of life in this house was essentially the road to disaster." *Id.* at 8.  The Court concluded that "much of the so-called other crimes and bad acts evidence introduced at trial went directly to the question of motive, intent to kill, and the absence of mistake, for [Petitioner's] defense was an unintended killing . . . ." *Id.*

The OCCA found that the trial court erred under state evidentiary law in admitting some of the other crimes/bad acts evidence because such evidence was either too remote or was admitted without a determination of whether its probative value was substantially outweighed by the danger of unfair prejudice.  Record, Ex. 3 at 9-10.[5]  However, notwithstanding the erroneous admission of some such evidence, the OCCA found that "the most damning evidence, the acts of physical abuse that [Petitioner] committed against Tina and [Petitioner's] subhuman treatment of the mentally retarded girl, were admissible on the issue of motive and in furtherance of the State's duty to prove malice aforethought." *Id.* at 10.  The OCCA held that the erroneous admission of such evidence was harmless as to both the conviction and the sentence, because "the jury ultimately chose to spare [Petitioner's] life, the most damaging character evidence was readily

_____

[5]The OCCA pointed out that at a hearing on the State's lengthy notice of intent to use other crimes and bad acts evidence, the trial judge ruled that evidence of hostile emotions between Petitioner and Tina appeared appropriate and relevant to motive and intent, but the judge delayed until trial ruling on the time frame with respect to such evidence.  Record, Ex. 3 at 9. The OCCA pointed out, and the record confirms, that at trial, any evidence that was identified in the State's *Burk's* notice was essentially admitted without an effort to determine in each instance whether such evidence comported with the Oklahoma Evidence Code, and specifically, whether "its probative value was substantially outweighed by the dangers of unfair prejudice, confusion of the issues, misleading the jury, or needless presentation of cumulative evidence." *Id.* at 9-10 and n.5.  *See also* Motion Hearing Tr. dated August 30, 2001, 114-138.

admissible, some of the evidence came in as a result of cross-examination, and the jury was properly instructed on the use of such evidence." *Id.* at 11 (citing *Simpson v. State*, 876 P.2d 690, 695 (Okla. Crim. App. 1994), for the proposition that "error that has no bearing on the outcome of the trial will not mandate reversal"). The Court specifically held that no error occurred with respect to testimony regarding Petitioner's alcohol habits because she "admitted consuming alcohol on the critical day and her tolerance thereof was an appropriate factor for the jury to consider." *Id.*

The "harmless beyond a reasonable doubt" standard articulated by the Supreme Court in *Chapman v. California*, 386 U.S. 18, 24 (1967), is the proper standard for state courts to apply when evaluating alleged instances of constitutional error on direct appeal. *Saiz v. Burnett*, 296 F.3d 1008, 1012 (10th Cir. 2002). *See also Bartell v. State*, 881 P.2d 92, 95-97 (Okla. Crim. App. 1994); *Simpson*, 876 P.2d at 701 (Okla. Crim. App. 1994) (citing *Chapman*, *supra*). From the OCCA's opinion and its specific citation to *Simpson*, it is not clear what harmless error standard the state appellate court applied in reaching its holding.[6] Assuming that the OCCA did not apply *Chapman* and did not reach the merits of Petitioner's federal due process claim, this Court exercises its "independent judgment" in deciding the claim. *Battenfield v. Gibson*, 236 F.3d 1215, 1220 (10th Cir. 2001). The appropriate harmless error standard to be applied on habeas review is from

---

[6]In *Simpson*, the OCCA held that in order for constitutional error to be deemed harmless, the Court must find beyond a reasonable doubt that it did not contribute to the verdict. *Simpson*, 876 P.2d at 701 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). However, in finding that the improper admission of other crimes evidence in Petitioner's trial was harmless error, the Court's citation to *Simpson* refers to a discussion of the scope and process of appellate review of allegations of error that were not preserved at trial and the level of error required for a reversal of a criminal conviction. *Simpson*, 876 P.2d at 695 ("Whatever the label, an error which has no bearing on the outcome of the trial will not mandate a reversal.").

*Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *See Webber v. Scott*, 390 F.3d 1169, 1177 (10th Cir. 2004) (declining to apply AEDPA deference where it was unclear whether OCCA reached the merits of the petitioner's federal due process claim; conducting harmless error analysis under *Brecht*); *Herrera v. Lemaster*, 301 F.3d 1192, 1199 (10th Cir. 2002) (applying *Brecht* when the state court did not apply *Chapman*).  *See also Arizona v. Fulminante*, 499 U.S. 279, 307-08 (1991) (holding trial error is subject to harmless error analysis).  Under *Brecht*, federal habeas relief on the basis of trial error is not proper unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623.[7]  If "grave doubt" exists about the harmlessness of the error, the Court must treat the error as though it had affected the verdict.  *See O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).  Moreover, on habeas review, a federal court will not disturb a state court's admission of evidence of prior crimes, wrongs or acts unless the probative value of such evidence was so greatly outweighed by the prejudice flowing from its admission that the admission denied the petitioner due process of law. *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002) (citing *Duvall v. Reynolds*, 139 F.3d 768, 787 (10th Cir. 1998)).

At trial, Petitioner admitted that Tina died as a result of the blows she inflicted on her; however, Petitioner claimed she killed Tina in a heat of passion brought on by mutual combat.  The principal question before the jury, therefore, was whether the State met its burden in proving beyond a reasonable doubt that Tina's killing was intentional.

---

[7]Errors of the "trial type" are those which occur during presentation of the case to the jury as opposed to "structural defects" which include such deprivations as the right to be represented by counsel. In this case, the court's decision to allow admission of other crime/bad act evidence beyond that related to motive, intent and state of mind is an error of the "trial type."  *See Brecht*, 507 U.S. at 629-630.

This Court must determine whether, in light of the record as a whole, the admission of evidence of certain of Petitioner's other bad acts or crimes "had substantial and injurious effect or influence in determining the jury's verdict." For the reasons set forth below and in light of the entire record, the undersigned finds that it did not.

In order to prove beyond a reasonable doubt that Petitioner was guilty of first degree murder, the State had to prove malice.[8] The OCCA found that the evidence regarding Petitioner's repeated and escalating abuse of Tina was admissible because it spoke directly to Petitioner's state of mind and gave the jury a complete understanding of the crime and Petitioner's intent on the date in question. *See Hale v. Gibson*, 227 F.3d 1298, 1321 (10th Cir. 2000) (noting that in Oklahoma other crimes evidence is admissible to show "motive, common scheme, identity, plan, knowledge, or absence of mistake or accident"); *cf.* Fed. R. Evid. 404(b) (evidence of other crimes or wrongs admissible to prove motive, intent, or absence of mistake or accident). The evidence of Petitioner's abuse of alcohol was also found to be relevant to the issue of intent because she testified that she had been drinking on the day Tina was killed. However, the OCCA also found

---

[8]In Oklahoma, in order prove the mental state malice aforethought, the State must show the defendant acted with a deliberate intention to take the life of another without justification. *Jackson v. State*, 964 P.2d 875, 885 (Okla. Crim. App. 1998). This intent may be "formed instantly before committing the act by which it is carried into execution." Okla. Stat. tit. 21, § 703. *See also* Original Record (O.R.) vol. 3 at 501 (Instruction No. 21).

Further, the law infers a design to effect death "from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed." Okla. Stat. tit. 21, § 702. Here, the jury was instructed:

The external circumstances surrounding the commission of a homicidal act may be considered in finding whether or not deliberate intent existed in the mind of the defendant to take a human life. External circumstances include words, conduct, demeanor, motive, and all other circumstances connected with a homicidal act.

O.R. vol. 3 at 503 (Instruction No. 22).

that the trial court improperly admitted certain other crimes evidence--specifically, Petitioner's history of drug abuse, her mistreatment of her husband Charles, her alleged misappropriation of Tina's disability checks and her theft of a prescription pad which she then used to obtain drugs--without determining whether such evidence was relevant and even if relevant, whether it was more prejudicial than probative,.

Notwithstanding the improper admission of certain other crimes evidence, the record includes strong, properly admitted evidence of Petitioner's malice such that the undersigned cannot say that the jury's verdict was the result of a fundamentally unfair trial.  Evidence of Petitioner's intent was introduced through her own testimony as well as the testimony of Christina Fann, Shirley Fennell, and Petitioner's son, Christopher Cooper.  At trial, Petitioner testified to events of the day Tina died, beginning with an argument she had with Tina and Christopher over missing money. Trial Tr. vol. 16 at 146.  According to Petitioner, after Christopher went to the bathroom to get ready for work, Tina hit her in the head with a plate and the two fought, grabbing and pulling hair. *Id.* at 146-47.  Petitioner testified that Tina went out the back door and returned with a piece of metal which she used to try to hit Petitioner.  *Id.* at 148.  Petitioner testified that she took the object from Tina and starting hitting her with it–three or four times in the face–and that Christopher came in and broke up the fight and then left for work.  *Id.* Petitioner testified that Tina went to another area of the house and after about an hour Petitioner went to talk to her and Tina wasn't breathing.  *Id.* at 150.  According to Petitioner, she shook Tina and attempted to give her mouth-to-mouth resuscitation and when she was unsuccessful she called a friend, Tony Trammel, who came over and

14

helped her put Tina's body in a trash can and place the trash can in the trunk of her car. *Id.* at 151, 154-160.[9]

Christina Fann, who lived in Missouri during most of the relevant time period, testified that her mother, Pamela Cheek, was Petitioner's best friend, that Petitioner and her children sometimes visited them and that Fann stayed with Petitioner and her family in Oklahoma for approximately three months in late 1998. Trial Tr. vol. 6 at 49-53. Fann testified that around Easter in April 1999, Petitioner, her husband and their children visited Fann and her mother in Missouri during which time she overheard Petitioner and her son Christopher arguing. *Id.* at 82, 199. Fann stated that she heard Petitioner stating "Murder, murder. Hanging it over my head. I'm tired of it. I don't care any more." *Id.* Later, Petitioner told Fann that Petitioner had killed Tina by hitting her with a sledgehammer because Tina walked in on Petitioner and her friends while she was doing drugs. *Id.* at 84-86, 155. Fann further testified that Petitioner told her Tina then lay on the floor repeating her name, that Petitioner called a friend saying she "messed up" and needed a gun, and when the friend hung up on her, she woke her husband Charles. *Id.* at 87. Additionally, Fann testified that Petitioner told her that she "hog-tied" Tina, put her in black trash bags and burned her. *Id.* at 84, 88.

Witness Shirley Fennell was incarcerated at the Oklahoma County jail on an outstanding Texas parole violator warrant on April 28, 1999, when Petitioner was brought into custody. Trial Tr. vol. 11 at 155. According to Fennell, Petitioner began

---

[9]The record reflects that the State called Tony Trammel as a rebuttal witness; Trammel testified that he had nothing to do with the disposal of Tina's body. Trial Tr. vol. 18 at 13. The record further reflects that on August 8, 2001, Petitioner's husband, Charles Hargrove, entered a plea of guilty to accessory to murder. Trial Tr. vol. 8 at 11; State's Exhibit 69A, 69B.

15

talking with Fennell immediately about her "case" and admitted killing her mentally retarded stepdaughter, who had been a thorn in her side for 15 years.  *Id.* at 164-65.[10] Fennell testified that Petitioner told her that she and Tina had a fight, that Tina left the house and then came back and hit her in the head with a plate.  *Id.* at 167-68.  Fennell further testified that Petitioner stated that she began beating  Tina with what may have been a fence post, that Tina tried to get away but the back door was stuck, that beating Tina "felt good" and that she was "like a shark in a eating frenzy."  *Id.* at 169-170, 175. Petitioner told Fennell that she had knocked some of Tina's teeth out, that Tina was beaten so severely that she said she wanted to lay down, that Petitioner watched for nearly two hours until Tina was no longer breathing and that she then put Tina in a trash bag.  *Id.* at 175-76.  Fennell testified that Petitioner stated she washed Tina the next day and put pajama bottoms on her but could not get a top on Tina because rigor had set in. *Id.* at 177-78.  Petitioner told Fennell that her husband Charles helped her place the trashbag containing Tina's body in the trunk of her car, that she later stopped and purchased some gas for her car and for a gas can, and then drove approximately six miles north of Shawnee, where she doused the body with gas and set it on fire.  *Id.* at 178-79. Petitioner told Fennell that she threw the object she used to beat Tina in the city dump and disposed of the clothes she and Tina had been wearing.  *Id.* at 175, 178.  Fennell testified that Petitioner said she next rented a carpet cleaner and scrubbed the rug in the house.  *Id.* at 180.  Although defense counsel thoroughly cross-examined Fennell

---

[10]Fennell met with her attorney on May 1, 1999, at the county jail regarding the information she had concerning Tina's death, and OSBI agents interviewed Fennell on May 3, 1999. Trial Tr. vol. 12 at 53; *see also* Trial Tr. vol. 13 at 21.  Fennell acknowledged that in exchange for her testimony the State had offered to write a letter to the Texas parole board on her behalf.  Trial Tr. vol. 11 at 156.

16

regarding the time frame of Petitioner's conversations with her and as to whether Fennell was aware of certain details of the crime that had been released in the media,[11] *id.* at 185-209; *see also* Trial. Tr. vol. 12 at 6-21, the record reflects that Fennell's testimony and her statement to the OSBI included details of Tina's murder that had not been mentioned in the media.[12]

The trial court determined that Christopher Cooper, Petitioner's son, was an unavailable witness, Trial Tr. vol. 17 at 87-123, and therefore, his testimony from two preliminary hearing proceedings was read to the jury. *Id.* at 126 (Court's Exhibits 3A and 3B). In the first preliminary hearing Christopher testified that he was home on the day Tina died, that Petitioner and Tina were arguing and that Tina threw a plate that hit Petitioner on the head. Court's Exhibit 3A at 37. He further testified that Tina ran outside and came back inside carrying a "metal looking pole" about four feet long which she swung at Petitioner. *Id.* at 37-38. According to Christopher, Tina did not strike Petitioner with the pole, *id.* at 49, but Petitioner took the pole or stick away from Tina

---

[11]During OSBI Agent Lahue's subsequent testimony defense counsel established that there were certain accounts of Tina's murder in the media that included some of the same details to which Fennell testified, and the State addressed this information on re-direct examination. Trial Tr. vol. 13 at 28-69. However, even following lengthy testimony and cross-examination of both Fennell and Agent Lahue, nothing in the record reflects that Fennell, who had been placed in the county jail the first week of April, Trial Tr. vol. 13 at 55, actually had been made aware of any of the facts and circumstances surrounding Tina's murder through exposure to the media.

[12]For example, nothing in the media releases reviewed at trial referred to the following facts testified to by Fennell: Petitioner's use of a gas can or that the gas can was in Petitioner's storage shed; that Tina had been a thorn in Petitioner's side for fifteen years; that Petitioner referred to Tina as "little bitch;" that Tina hit Petitioner with a plate on the day of the assault; that her husband Charles was not home during the fight; that a man named Harry was asleep in another bedroom during Tina's beating; that Petitioner was unable to get a shirt on Tina because her body had stiffened; that Charles Hargrove had helped Petitioner place Tina's body in the trunk of Petitioner's car, which was a blue Baretta; that Tina's body was removed from the trunk and placed in a bar ditch on its side; and the name of Petitioner's attorney. *See* Trial Tr. vol. 13 at 57-69.

and hit her with it twice in the face.  *Id.* at 38-39, 40.  Christopher testified that his brother Bobby then came into the room and the two boys stopped the fight.  *Id. at* 37, 39. He testified that Tina went into a bedroom and his mother asked about Tina about one hour later, so he looked in and saw her sitting on a bed.  *Id.* at 50.  Christopher testified that he then left for work and returned that night.  *Id.* at 54.  Finally, Christopher admitted that he initially lied to OSBI officials because Petitioner told him and the other children to lie about the incident and to explain that Tina left home with a boyfriend. *Id.* at 64.  Christopher essentially testified to the same material facts during the second preliminary hearing and further stated that on the day Petitioner beat Tina with the metal pole, he left for work and never saw Tina again.  *See generally* Court's Exhibit 3B and at 44.

In sum, in addition to the improperly admitted evidence of Petitioner's other bad acts, the jury was presented with a substantial amount of properly introduced evidence bearing on Petitioner's motive, intent and state of mind, and sufficient to convince the jury that  Petitioner, acting with malice, committed first degree murder. The record shows that Tina was mentally retarded, *see* State's Exhibit 64, and of slight build – 5 feet 2 inches in height, weighing 115 pounds. Trial Tr. vol. 7 at 203.  Nothing in the record indicates that Tina ever struck Petitioner.  Rather, the record contains consistent testimony that Petitioner took the object from Tina and struck her multiple times in the face.  Evidence was presented that after inflicting serious injuries, Petitioner failed to seek emergency or medical help for her stepdaughter.  Thus, the undersigned finds that substantial properly admitted evidence of Petitioner's malice toward the victim supports

the OCCA's finding that the improperly admitted other crimes evidence was harmless. In particular, the undersigned agrees with the OCCA that the potential prejudicial effect of the improperly admitted other crimes evidence – evidence of drug abuse, mistreatment of Petitioner's husband, misappropriation of Tina's disability check and theft of a doctor's prescription pad – pales in comparison to the impact of the bad acts/other crimes evidence of abuse which was properly admitted and considered by the jury. Additionally, the jury was instructed on the limited purpose for which the other crimes evidence was admitted, and the jury is presumed to have followed these instructions.[13] *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).   Moreover, the fact that the jury declined to find aggravating circumstances required for the imposition of the death penalty supports the OCCA's conclusion that the erroneous admission of certain bad acts by Petitioner did not result in a fundamentally unfair trial.

When viewed in the context of the entire trial record, the undersigned therefore cannot say that the erroneous admission of evidence of other bad acts had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 623.  Nor did the erroneous admission of other bad acts render Petitioner's trial so fundamentally unfair as to constitute a denial of federal constitutional rights.  *See*

---

[13]The trial court instructed the jury:

Evidence has been received that the defendant has allegedly committed offenses other than that charged in the information.  You may not consider this evidence as proof of the guilt or innocence of the defendant of the specific offense charged in the information.  This evidence has been received solely on the issue of the defendant's alleged motive, opportunity, or intent.  This evidence is to be considered by you only for the limited purpose for which it was received.

O.R. vol. 3 at 492 (Instruction No. 11).

*Turrentine v. Mullin*, 390 F.3d 1181, 1191 (10th Cir. 2004) (holding jury instructions that were incoherent and improperly contained instruction on doctrine of transferred intent was harmless error under *Brecht* and did not infect the entire trial in a violation of due process), *cert. denied*, 125 S.Ct. 2544 (2005).   Thus, Petitioner is not entitled to habeas relief in Ground One.

**Ground Two - Admission of Photographs**

In Ground Two Petitioner argues that she was deprived of a fair trial and a reliable sentencing procedure by the admission of numerous irrelevant and highly prejudicial photographs of the victim's partially burned body.   Petition at 3.   On direct appeal, Petitioner claimed that many of the photographs were irrelevant and that any probative value of these photographs was outweighed by their prejudicial impact.   Petition, attached Brief of Appellant at 26-28.

The OCCA found that of the photos of the victim admitted at trial only four or five were particularly relevant and were more probative than prejudicial and the remainder were "fairly repetitive and cumulative."   Record, Ex. 3 at 12.   Specifically, the Court found that while one photograph would have sufficed to show that the victim's body had been burned and abandoned in a ditch, nine photos were admitted, differing only in that they had been taken at different angles.   *Id.* (citing State's Exhibits 5, 7, 9, 10, 11, 12, 13, 14, and 19).   The OCCA also found that eight closeup photographs of the victim's burned and disfigured face were repetitive and only two showed the absence of teeth and lacerations to the chin and left eye.   *Id.* (citing State's Exhibits 20-28).   With respect to three photographs showing the victim's nude body (State's Exhibits 26-28), the OCCA

found that relevant wounds such as bruising and lacerations to the knee and defensive wounds to the hand could have been depicted in a less inflammatory manner. *Id.* at 13.

However, the Court held that any error in the admission of repetitive and cumulative photos was "harmless beyond a reasonable doubt" because the crime itself was gruesome and thus it was not error to allow the jury to view the body in its poor condition. *Id.* The Court also found that the showing of defensive wounds to the hand was relevant to Petitioner's claim of accident, that the photos that were properly admitted were gruesome on their own, and that the jury viewed the entire collection and yet declined to find sufficient aggravating circumstances necessary to impose the death penalty recommending instead life without parole. *Id.*

Here, the OCCA applied the relevant Supreme Court law – the harmless error standard of *Chapman v. California*, 386 U.S. 18 (1967) – which requires the State to establish that the error was harmless beyond a reasonable doubt. Thus, this Court gives deference to the OCCA's finding of harmless error with respect to a violation of Oklahoma's evidentiary statutes, and the question is whether the OCCA's application of the *Chapman* standard was objectively unreasonable. *Saiz v. Burnett*, 296 F.3d 1008, 1012 (10th Cir. 2002) ("[T]he proper question on federal habeas review is whether the [OCCA's] application of the *Chapman* standard was objectively unreasonable.") (citing *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001)).

Petitioner does not argue that the OCCA's decision in this regard was contrary to or an unreasonable application of clearly established federal law as enunciated by the Supreme Court. Instead, Petitioner merely references her direct appeal brief, in which

she argued that admission of the photographs was error under Oklahoma law.  As previously noted, "[f]ederal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights." *Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir. 1999).  "The essence of [the court's] inquiry under the Fifth, Sixth, and Eighth Amendments, as applied to the states under the Fourteenth Amendment, is whether the admission of the photographs rendered the proceedings fundamentally unfair." *Id.* at 1275 (citation omitted).  "[B]ecause a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must tread gingerly and exercise considerable self-restraint." *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (quotations omitted); *see also Bullock v. Carver*, 297 F.3d 1036, 1055 (10th Cir. 2002) (recognizing that only a narrow category of infractions violates fundamental fairness); *Jackson v. Shanks*, 143 F.3d 1313, 1322 (10th Cir. 1998) (approaching fundamental-fairness analysis with "considerable self-restraint") (quotation omitted).

In *Thornburg v. Mullin*, 422 F.3d 1113, 1128 (10th Cir. 2005), the petitioner challenged the admission of six photographs "depicting the charred remains of the victims' bodies, as and where they were found."  In that case, as here, the petitioner did not dispute the manner of death.  Nonetheless, the Tenth Circuit determined that "the state still bore the burden to convince the jury that its witnesses, both eyewitnesses and experts, provided an accurate account of events [and] [t]he photographs corroborated their accounts." *Id.* at 1129.  *See also Smallwood*, 191 F.3d at 1275 (finding photographs depicting charred remains of murder victim did not render trial fundamentally unfair

given the probative nature of the photographs, the gruesome nature of the crime and the wealth of additional evidence supporting the conviction).

Likewise, in this case, the photos were generally relevant in corroborating other witnesses' testimony regarding Petitioner's accounts to them about Tina's death, the testimony of the medical examiner that the cause of death was homicidal violence, the location, condition and position of the victim, the nature of the crime, and the victim's defensive wounds.   The fact that certain of the photos were found to be erroneously admitted as cumulative and repetitive, did not render Petitioner's trial fundamentally unfair.   As in *Thornburg*, the undersigned has reviewed the record under AEDPA's constraints and finds that "in light of the probative value of the pictures, the gruesome nature of the crime, and the other evidence incriminating [Petitioner]," Petitioner has failed to show that the admission of certain photographs rendered her trial fundamentally unfair.  *Thornburg*, 422 F.3d at 1129.

Thus, the OCCA's determination that the admission of certain of the photographs, while repetitive, was harmless beyond a reasonable doubt did not result in a decision that was contrary to or an unreasonable application the harmless-error analysis in *Chapman, supra*.   Accordingly, Ground Two should be denied.

**Ground Three - Admission of Evidence of Positive Luminol Blood Tests**

In her third ground for relief, Petitioner claims that the trial court erred by permitting the State to introduce evidence of positive luminol blood tests.  Petition at 3.

On direct appeal, relying on Oklahoma case law, Petitioner objected to the admission of OSBI criminalist Jamie Yorkston's testimony that certain stains in the southwest bedroom of Petitioner's home discovered through the use of luminol testing were composed of blood, even though subsequent confirmatory tests did not confirm the presence of blood. Petition, attached Brief of Appellant at 28. Petitioner also claimed on appeal that the evidence was irrelevant and the introduction of such evidence rendered her trial fundamentally unfair in violation of her due process rights. *Id.* at 33. The OCCA rejected this claim, noting that blood evidence played an insubstantial role in the trial and finding a "complete absence of prejudice" because defense counsel throughly cross-examined the expert concerning the luminol testing and "somewhat relied on the same evidence" to support Petitioner's defense. Record, Ex. 3 at 14.

"When, as in this case, no particular constitutional guarantees are implicated, such evidentiary objections merely raise questions of state law and therefore, are cognizable on habeas only if the alleged error was so grossly prejudicial [that it] fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Revilla v. Gibson*, 283 F.3d 1203, 1212 (10th Cir. 2002) (quotation omitted; alteration in original). Petitioner fails to meet this burden.

Even assuming the luminol evidence was of erroneously admitted, after considering the trial record as a whole, the undersigned finds that Petitioner has failed to show that this evidence was grossly prejudicial. First, Yorkston made it clear that the luminol testing was merely a presumptive test and not conclusive. Trial Tr. vol. 10 at 118. Further, Yorkston admitted that the subsequent tests could not confirm the

presence of blood in the areas of luminol testing.  *Id.* at 111-15, 119, 128, 210.  Petitioner

did not object to Yorkston's testimony and actually used Yorkston's testimony during

cross-examination to establish not only the absence of a confirmation of human blood or

blood spatters in Petitioner's home but also the absence of any evidence of an attempt to

clean blood from the rugs or walls.  *Id.* at 160-61, 168-69, 209-210.  As found by the

OCCA, the testimony concerning luminol testing was a small and insubstantial portion

of the evidence presented to the jury.  The undersigned finds that the admission of

luminol evidence did not so infect the trial with unfairness as to deprive Petitioner of due

process, particularly in view of the strong evidence of Petitioner's guilt as discussed in

connection with Grounds One and Two.  Petitioner has failed to demonstrate that the

OCCA's rejection of this claim was contrary to or an unreasonable application of clearly

established Supreme Court jurisprudence.  Petitioner therefore is not entitled to habeas

relief on Ground Three.

### Ground Four - Admission of Agents Lahue and Collins' Testimony

In Ground Four Petitioner alleges that her constitutional rights were violated by

the admission of the opinions of OSBI Agents Lahue and Collins that the informant,

Shirley Fennell, was providing truthful and sincere testimony.  Petition at 3. Petitioner

argued on direct appeal that the State first attempted to bolster Fennell's testimony

through the testimony of Agent Lahue, who interviewed Fennell at the county jail, by

eliciting testimony on direct examination that the agent believed Fennell's testimony to

be truthful.  Petition, attached Brief of Appellant at 33 (citing Trial Tr. vol. 12 at 129-130).

Petitioner also pointed to Lahue's response to counsel's question on cross-examination

that he did not believe he had been "conned" by Fennell. *Id.* at 34 (citing Trial Tr. vol. 13 at 50). Additionally, Petitioner objected to Lahue's statement that he believed Fennell because of her sincerity, her compassion for the victim and her apparent anger about Petitioner's acts. *Id.* (citing Trial Tr. vol. 13 at 71-72).

Petitioner alleged that Agent Collins also improperly vouched for Fennell's credibility by describing her as intelligent, cooperative, businesslike and sincere. Petition, attached Brief of Appellant at 34. (referring to Trial Tr. vol. 14 at 98-99). Although defense counsel's objection to Collins' testimony was sustained and the jury was admonished to ignore the answer, Petitioner alleged that the agent's testimony amounted to a personal opinion of guilt that invaded the province of the jury in violation of her right to due process and a trial by jury. *Id.* at 35.

The OCCA found that although the officers' opinions regarding the witness' truthfulness were erroneously admitted, such evidence "did not deprive [Petitioner] of due process, the right to confront witnesses, or a fair trial" for the following reasons:

> The trial judge correctly sustained two objections and admonished the jury to disregard the comments, when defense counsel so requested. Defense counsel extensively cross-examined witnesses regarding this matter, i.e., whether or not Ms. Fennell had provided information to officers that had never been shared with the media. Both sides spent considerable effort in presenting their point of view regarding the source of Fennell's story.

Record, Ex. 3 at 15. The OCCA also found that "the same conclusion was made as plain as day when they testified to evidence Fennell shared that seemed to corroborate some

of the evidence never shared with the media." *Id.*[14]  The Court concluded that "any error was cured or was harmless in the context of this trial." *Id.*

Because the OCCA determined that the trial court's error in admitting Agent Lahue's opinion of Fennell's truthfulness was harmless error but did not articulate the standard it applied, this Court analyzes the claim by exercising its "independent judgment." *Battenfield v. Gibson*, 236 F.3d at 1220.  Thus, the appropriate standard to be applied to Petitioner's constitutional claim is from *Brecht*.  That is, Petitioner must show that the error had a "substantial and injurious effect" in determining the jury's verdict. *Brecht*, 507 U.S. at 623.  Additionally, Petitioner's claim based on state court evidentiary rulings does not merit habeas relief unless the error fatally infected the trial and resulted in a denial of fundamental fairness.  *Revilla v. Gibson*, 283 F.3d at 1212.

Petitioner fails to show that Agent Lahue's testimony meets this standard. Fennell's credibility was vigorously attacked by Petitioner's counsel.  As previously noted in the discussion regarding Ground One, both Fennell and Lahue were thoroughly cross-examined as to the possibility that Fennell's testimony was not credible because it was based on information released by the media rather than statements made to her by Petitioner.   There is no indication that the jury was unduly influenced by Lahue's testimony in considering Fennell's credibility.

Additionally, because the trial court admonished the jury to disregard Agent Collins' remarks, and "[a] jury is presumed to follow its instructions," *see Weeks v.*

---

[14]The Court also noted that defense counsel competently demonstrated that much of this evidence had indeed been reported in the media or had been fed to Fennell by officers during questioning.   Record, Ex. 3 at 15.

*Angelone*, 528 at 234, Petitioner fails to show the Agent Collins' testimony violated her right to due process.

Thus, the undersigned finds that Petitioner has failed to show that the challenged statements of Agents Lahue and Collins, in light of the whole record, rendered her trial fundamentally unfair. There is likewise no showing by Petitioner that the erroneously admitted testimony "substantially influence[d]" the outcome of the trial. *Brecht,* 507 U.S. at 623. Accordingly, Petitioner is not entitled to habeas relief on Ground Four.

## Ground Five - Admission of Hearsay Testimony

Next Petitioner alleges that her state and federal constitutional rights were violated by the admission of certain out-of-court statements. Petition at 3. On direct appeal Petitioner alleged that the trial court improperly allowed the playing of a tape recording containing jailhouse informant Fennell's unsworn out-of-court statements to OSBI Agents Collins and Lahue because this evidence was inadmissable hearsay testimony under Oklahoma law and served only to bolster Fennell's testimony, in violation of Petitioner's right to confront the witnesses against her. Petition, attached Brief of Appellant at 36-37. Petitioner also challenged OSBI Agent Garrett's testimony detailing Charles Hargrove's out-of-court statements to OSBI agents on April 28 and 29, 1999, and alleged such testimony was improperly admitted under the Oklahoma Evidence Code as impeachment testimony. *Id.* at 37-38.

With respect to Fennell's recorded statements, the OCCA, noting that defense counsel did not object, found no plain error in the playing of the Fennell's tape-recorded

28

statements.  Record, Ex. 3 at 16 (citing *Simpson*, 976 P.2d at 693).[15]  The OCCA further

found no error in the admission of Charles Hargrove's prior inconsistent statements made

to the OSBI, noting that such evidence was admissible as extrinsic evidence under Okla.

Stat. tit. 12, § 2613(B), in light of  Hargrove's "extensive, laborious testimony, where he

repeatedly claimed to have virtually lost all memory of the day of Tina's death or prior

statements had given in that regard."  Record, Ex. 3 at 16.  The OCCA further found that

although Agent Garrett's testimony regarding portions of Charles' prior consistent

statements was improper under § 2613, such testimony was arguably permissible hearsay

under the exception in § 2804 for an unavailable witness.  *Id.*  The OCCA concluded that

the admission of the challenged hearsay testimony, whether erroneous or not, "did not

render [Petitioner's] trial unfair."  *Id.*

The undersigned agrees that the statements challenged by Petitioner, when viewed

in the context of the trial as a whole, were not so grossly prejudicial as to render the trial

fundamentally unfair.  *See e.g., Thomas v. Gibson*, 218 F.3d 1213, 1225 (10th Cir. 2000)

(claim that admission of hearsay evidence rendered habeas petitioner's trial

fundamentally unfair required "review of entire record" and consideration of the error

"in relation to all else that happened").   With respect to Fennell's tape recorded

statements, Petitioner fails to show how she was prejudiced by such evidence.  Fennell

testified at trial and defense counsel thoroughly cross-examined her as to every aspect

---

[15]The Tenth Circuit has held the OCCA's determination that the admission of certain evidence does not amount to plain error is entitled to deference under 28 U.S.C. § 2254(d) on habeas review of a claim of fundamental unfairness, as there was "no practical distinction between the formulations of plain error [under Oklahoma law] and the federal due-process test, which requires reversal when error 'so infused the trial with unfairness as to deny due process of law.'"  *Thornburg v. Mullin*, 422 F.3d 1113, 1125  (10th Cir. 2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 75 (1991)).

of her testimony, particularly the time frame of her discussions with Petitioner and her possible exposure to the media or news broadcasts concerning the details of Tina's murder.   As to Petitioner's challenge of the admission of Charles Hargrove's prior consistent statements and his inconsistent statements, she fails to show how her trial was rendered fundamentally unfair in light of the strong evidence of her guilt of first degree malice murder, as previously discussed in Ground One.

After consideration of the entire trial record, the undersigned finds that Petitioner fails to show that the admission of these challenged out-of-court statements rendered her trial so fundamentally unfair as to constitute a denial of her federal constitutional rights. Accordingly, the OCCA's rejection of this claim was not contrary to or an unreasonable application of federal law.   Therefore, habeas relief should be denied in Ground Five.

**Ground Six - Admission of Petitioner's Statements to OSBI**

In Ground Six, Petitioner alleges that the trial court's admission of her statements to agents of the Oklahoma State Bureau of Investigation ("OSBI") violated her constitutional rights.   Petition at 3.   On April 28, 1999, OSBI agents interviewed Petitioner, who initially denied knowing anything about the death, then stated that Tina had run away with a carnival worker, and finally admitted that she fought with Tina twice on the date in question. *See* Record, Ex. 3.   Petitioner stated that her husband left the home during the first fight because he didn't want to see them fight.   Petitioner told the OSBI agents that the second fight began when Tina hit her in the head with a plate. Petitioner stated she chased Tina out of the house, but Tina returned with a piece of a fence referred to as a "T-post."   Petitioner then punched Tina in the face, causing the girl

to fall down. Petitioner further stated that she hit Tina in the face at least four times with the T-post and knocked out some of her teeth. Petitioner told authorities that Tina remained on the floor for approximately two hours and then she finally stopped breathing. Petitioner stated that she put Tina's body in the trash bag and then in a trash can. When Petitioner's husband returned, she told him to put the garbage bags, including the one with Tina's body, in the trunk. Petitioner stated that she dumped Tina's body in a ditch.

On direct appeal Petitioner argued that she was in police custody when she was transported to the OSBI headquarters office in Oklahoma City and that she was subjected to interrogation from 6:30 p.m. to approximately 11:30 p.m. without being advised of her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Petition, attached Brief of Appellant at 40-44. She further argued that the admission of her statements was not harmless error. *Id.* at 44 (citing *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)).

Under the United States Supreme Court's ruling in *Miranda v. Arizona*, 384 U.S. 436 (1966), statements made during a custodial interrogation are not admissible against a defendant if officers fail to warn defendant of constitutional rights before the custodial interrogation. A custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*, 384 U.S. at 444.

Petitioner filed a pretrial motion to suppress her statement, arguing that having been transported by OSBI agents from Midwest City to the OSBI headquarters office in Oklahoma City, she was in custody but had not been advised of her constitutional rights

31

under *Miranda* before she made inculpatory statements.  O.R. vol. 2 at 297-309.  At a hearing on the motion,  the trial judge ruled that a reasonable person in Petitioner's place would have felt free to stop the interview and request to leave and therefore she was not in custody and not entitled to a *Miranda* warning.  Motion Hearing Tr. (August 30, 2001) at 106-09.

In determining Petitioner's custody status at the time of her OSBI interview, the OCCA applied *Oregon v. Mathiason*, 429 U.S. 492 (1977) and *Stansbury v. California*, 511 U.S. 320, 322-23 (1994), and found that under the "totality of the circumstances," although "the interview was, arguably, non-custodial in the beginning, when it became confrontational, accusatory and [Petitioner] was not free to leave, the interview was surely custodial at that point."  *Id.* at 19.  Thus, the Court concluded that Petitioner's statements thereafter to the police without the benefit of a *Miranda* warning were erroneously admitted at trial.  *Id.*  However, the Court found that the error was "harmless beyond a reasonable doubt, based on the entire record, including the trial testimony of Christina Fann, Shirley Fennell, and [Petitioner's] testimony, among others."  *Id.*  The Court continued:

> There is really no doubt that [Petitioner] killed Tina.  The only question is malice aforethought, and we find the record to be quite strong on this point. Even assuming there was a situation of mutual combat, that combat pitted a large, overbearing defendant against a much small, weaker young girl with the mind of a ten-year old.  The record is replete with supporting evidence of [Petitioner's] ever-growing state of malice against her stepdaughter.

Record, Ex. 3 at 19-20.

Here, the OCCA's language reflects that it applied the harmless error standard of *Chapman v. California*, 386 U.S. 18 (1967) – which requires the State to establish the error was harmless beyond a reasonable doubt. *See Arizona v. Fulminante*, 499 U.S. 279, 306-12 (1991) (applying harmless error analysis to confession coerced in violation of Fifth Amendment); *United States v. Perdue*, 8 F.3d 1455, 1469 (10th Cir. 1993) (applying harmless error analysis to admission of statement made in violation of *Miranda*).  Thus, this Court's "inquiry [on habeas review] is limited to whether the application of [*Chapman v. California*] was unreasonable when the Oklahoma Court of Criminal Appeals determined that this error was harmless beyond a reasonable doubt." *Pickens v. Gibson*, 206 F.3d 988, 996 (10th Cir. 2000).[16]

Having carefully reviewed the record, the undersigned finds that the OCCA's application of the *Chapman* standard was reasonable.   While the admission of Petitioner's statements to OSBI agents was clearly erroneous, the prejudicial effect of such evidence was significantly reduced by Petitioner's own testimony at trial which demonstrated that she deliberately and intentionally struck Tina multiple times with a piece of metal fence post, that she failed to seek or provide medical treatment for Tina,

---

[16]Respondent discusses relevant Supreme Court law concerning the issue of when *Miranda* warnings are required and contends that the OCCA was "incorrect" in its determination that Petitioner was subjected to custodial interrogation and that her statements were therefore improperly admitted at trial. Response at 28-32.  However, the record shows that the OCCA identified relevant Supreme Court law, and thus the relevant inquiry is not whether the OCCA's application of federal law was incorrect, but whether it was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. at 409; *see also Bell v. Cone*,  535 U.S. 685, 694 (2002) ("an unreasonable application is different from an incorrect one").   Respondent makes no argument that the OCCA's finding of a *Miranda* violation is contrary to or an unreasonable application of Supreme Court law but contends that the OCCA's decision that admission of Petitioner's statements was harmless error does not merit relief under the standards set forth in 28 U.S.C. § 2254(d)(1).  As discussed herein, Petitioner is not entitled to habeas relief because the OCCA's decision that the *Miranda* violation was harmless beyond a reasonable doubt is not contrary to or an unreasonable application of *Chapman v. California*, 386 U.S. 18, 24 (1967).

and that she then arranged for the disposal of Tina's body.  Moreover, as previously discussed in the context of Petitioner's claim in Ground One, other evidence of Petitioner's intent was presented to the jury, including testimony by Christina Fann that Petitioner told her she killed Tina with a sledgehammer because Tina saw her using drugs; testimony by jail informant Shirley Fennell that Petitioner admitted beating Tina to death in a "frenzy" and disposing of her body; and the testimony by Petitioner's son, Christopher Cooper, that Petitioner struck Tina more than once in the face with a metal fence post.  After hearing all the evidence, including Petitioner's erroneously admitted statement to the OSBI, the jury found Petitioner guilty of murder in the first degree but declined to recommend the death penalty.

The undersigned finds that the OCCA's determination that the admission of Petitioner's statements absent a *Miranda* warning was harmless beyond a reasonable doubt was a reasonable application of controlling Supreme Court precedent, specifically, *Chapman v. California*.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

## Ground Seven - Exclusion of Linda Bidwell's Testimony

Defense counsel sought to impeach Shirley Fennell's testimony regarding the statements Petitioner allegedly made to her in jail with the testimony of Linda Bidwell, who was being held in the Oklahoma County jail during the same time period.  The State objected on grounds that the defense had failed to disclose this witness in a timely

fashion.[17]  Trial Tr. vol. 12 at 21-23.  In two separate *in camera* hearings, defense counsel advised that Bidwell would testify she overheard Fennell state that she got a "deal" with the State to serve the rest of her time in Oklahoma instead of Texas.  Trial Tr. vol. 12 at 30, 34; Trial Tr. vol. 16 at 70, 74-83, 82-83.  The trial court refused to allow Bidwell's testimony, finding that beyond thorough cross-examination of Fennell the proposed testimony would not be probative as to Fennell's credibility.  Tr. vol. 12 at 38-39; Trial Tr. vol. 16 at 88-89.

As on direct appeal Petitioner claims in Ground Seven that Bidwell's testimony should have been admitted under Oklahoma law because her testimony was more probative than prejudicial on the issue of Fennell's credibility.  Petitioner contends that the exclusion of Bidwell's testimony violated her rights under the Sixth and Fourteenth Amendments.  Petition at 3; Petition, attached Brief of Appellant at 45-46.  On direct appeal the OCCA determined that the trial court did not abuse its discretion by *in camera* ruling excluding this evidence.  Record, Ex. 3 at 20.  The Court specifically found that Bidwell's proffered testimony was broad, unspecific, and not inconsistent with previous testimony, including testimony that prosecutors had agreed to write a letter on Fennell's behalf.  *Id.*

A criminal defendant's right to due process and compulsory process includes the right to present witnesses in her own defense.  *Washington v. Texas*, 388 U.S. 14, 18-19, (1967).  "The right to offer the testimony of witnesses, and to compel their attendance,

---

[17]Under the Oklahoma Criminal Discovery Code, a defendant must provide the State with the names of defense witnesses and a summary of the expected testimony.  *See* Okla. Stat. tit. 22, § 2002(B)(1)(a).  Discovery must be completed within ten days of trial.  Okla. Stat. tit. 22 § 2002(D).  When a party fails to timely disclose testimony, the court can exclude the evidence.  Okla. Stat. tit. 22, § 2002(E)(2).

if necessary, is in plain terms the right to present a defense . . . . This right is a fundamental element of due process of law." *Id.* at 19.  This includes the right to have the jury hear the testimony a defendant's witnesses are called to give.  *See Rock v. Arkansas*, 483 U.S. 44, 55 (1987).  However, the Supreme Court has held that exclusion of a defense witness as a discovery sanction does not necessarily violate the Sixth Amendment.  *Taylor v. Illinois*, 484 U.S. 400, 412-16 (1988).  When a lesser sanction "would perpetuate rather than limit the prejudice to the State and the harm to the adversary process," preclusion of a witness is justified.  *Id.* at 413; *see also United States v. Russell*, 109 F.3d 1503, 1509 (10th Cir. 1997) ("Excluding witnesses for failure to comply with discovery orders, if not an abuse of discretion, does not violate a defendant's Sixth Amendment right to compulsory process.").

As with the previous claims based on alleged trial court errors, Petitioner is not entitled to habeas relief on the basis of this challenged evidentiary ruling unless she can show that the exclusion of evidence rendered her trial fundamentally unfair, i.e., that the exclusion of evidence "fatally infected the trial" and "necessarily prevent [ed] a fair trial." *Richmond v. Embry*, 122 F.3d 866, 872 (10th Cir. 1997) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982)).  "It is the materiality of the excluded evidence to the presentation of the defense that determines whether a petitioner has been deprived of a fundamentally fair trial." *Maes v. Thomas*, 46 F.3d 979, 987 (10th Cir. 1995).

Here, Petitioner fails to show that her trial was rendered unfair by the exclusion of Bidwell's testimony.  Fennell testified that she met Petitioner in the Oklahoma County jail where she was incarcerated awaiting transfer to Texas on a warrant for her arrest for

a parole violation.  She testified further that the State had offered to write a letter on her behalf to the Texas parole board.  According to defense counsel, Bidwell would have testified that Fennell spoke of receiving a good "deal," specifically serving her time in Oklahoma rather than Texas, in return for her testimony.  Given Fennell's own admission that she expected some consideration from the State as a result of her testimony, the undersigned agrees with the OCCA that "Bidwell's proffered testimony was broad, unspecific, and not inconsistent with previous testimony."  Record, Ex. 3 at 20.  Thus, Petitioner has failed to show that the exclusion of Bidwell's testimony was not sufficiently material to deprive Petitioner of a fundamentally fair trial.

The OCCA's rejection of this claim was not contrary to or an unreasonable application of federal law.  Accordingly, habeas relief should be denied on Ground Seven.

## Ground Eight - Refusal to Give First Stage Jury Instruction on Punishment Range for First Degree Manslaughter

In her eighth ground for habeas relief, Petitioner again merely duplicates in conclusory fashion her direct appeal argument without attempting to define a constitutionally-based argument.  In her direct appeal brief, Petitioner acknowledged that at the conclusion of the first stage of trial (guilt-innocence), the jury was instructed on the elements of the  lesser included offense of first degree manslaughter. Petition, attached Brief of Appellant at 47; *see also* O.R. vol. 3 at 505-514 (Instruction Nos. 24-33). Nonetheless, Petitioner asserted that the trial court erred by refusing to instruct the jury at that stage that the range of punishment for first degree manslaughter is four years to life imprisonment.  *Id.* (citing Okla. Stat. tit. 21, § 715 (2001)).  In support of this claim,

Petitioner argued that the jury knew from the beginning of trial that first degree murder was punishable by death, life without parole, or life, and therefore, it was error to give the jury the option of finding Petitioner guilty of the lesser included offense of first degree manslaughter without also informing the jury of the sentencing range for this offense during the first phase of the trial.  According to Petitioner, without such information the jury "did not know how seriously it could punish [Petitioner] for first degree manslaughter, and would not find out unless they convicted [Petitioner] of that offense." Petition, attached Brief of Appellant at 47.   The OCCA rejected this claim and held that "[t]he instructions, taken as a whole, fairly and accurately state the applicable law." Record, Ex. 3 at 20 (citing *Freeman v. State*, 876 P.2d 283, 289 (Okla. Crim. App.  1994)).

Unless the Constitution mandates a particular jury instruction be given, a habeas petitioner must show that, in the context of the entire trial, the failure to give the instruction was so fundamentally unfair as to deny the petitioner due process.  *See Middleton v. McNeil*, 541 U.S. 433, 437 (2004); *Spears v. Mullin*, 343 F.3d 1215, 1244 (10th Cir. 2003).  Here, the trial court instructed the jury on the elements of both first degree murder and the lesser-included offense of first degree manslaughter.  Petitioner does not argue that the Constitution or Supreme Court law requires a trial court to instruct the jury in the guilt/innocence stage of trial on the sentencing range for a lesser offense.  Thus, Petitioner has not shown that the OCCA's rejection of this claim was contrary to, or an unreasonable application of, Supreme Court jurisprudence.  The omission of a jury instruction on the sentencing range of first degree manslaughter during the first phase

of trial did not render Petitioner's trial fundamentally unfair.  Accordingly, Petitioner is not entitled to federal habeas relief concerning this claim.

## Ground Nine - Refusal to Give Jury Instruction on Voluntary Intoxication

In Ground Nine, Petitioner argues that the trial court erred when it refused to instruct the jury on the defense of voluntary intoxication.  In her direct appeal brief, Petitioner argued that based on certain statements she made to OSBI Agent Collins during the April 28, 1999, interview and certain statements made by her son Christopher Cooper, concerning her alcohol and drug abuse "it is entirely possible that at the time of the fight with Tina," her mental facilities were "so dulled that she fought without forming any specific intent to kill."  Petition, attached Brief of Appellant at 49.  The trial court refused to issue the instruction.  Trial Tr. vol. 18 at 65-69.  The OCCA held the trial court's refusal to issue such instruction was proper and did not constitute an abuse of discretion, "[b]ased upon [Petitioner's] testimony that she was not drunk or stoned that day and that she did not feel alcohol and drugs played a part in the beating death of her stepdaughter."  Record, Ex. 3 at 21.

There is no Supreme Court precedent establishing a constitutional right to instructions regarding the defendant's intoxication at the time of the crime.  *Spears v. Mullin*, 343 F.3d at 1244 (citing *Montana v. Egelhoff*, 518 U.S. 37, 39-40, 43, 51, 56 (1996)).  Under Oklahoma law, however, juries may consider voluntary intoxication in determining whether a defendant had the intent to commit first-degree murder.  *See, e.g., Bland v. State*, 4 P.3d 702, 715 (Okla. Crim. App. 2000); *Fitzgerald v. State*, 972 P.2d 1157, 1174 (Okla. Crim. App. 1998); *Lamb v. State*, 767 P.2d 887, 889-90 (Okla. Crim. App.

1988).  As just discussed in Ground Eight, Petitioner must show that the trial court's refusal to instruct the jury on voluntary intoxication resulted in a denial of fundamental fairness and due process.  *Spears*, 343 F.3d at 1244.  A petitioner attacking a state court judgment based on a refusal to give a requested jury instruction bears a great burden.  *Tyler v. Nelson*, 163 F.3d 1222, 1227 (10th Cir. 1999). This is because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)) (internal quotations omitted).

Under Oklahoma law, a trial judge first has a duty to decide whether the voluntary intoxication defense is sufficiently raised to warrant an instruction.  *Jackson v. State*, 964 P.2d 875, 892 n.5 (Okla. Crim. App. 1998).  The defense of voluntary intoxication requires that a defendant, "first, be intoxicated and, second, be so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent or special mental element of the crime."  *Id.*; *see also Frederick v. State*, 37 P.3d 908, 942 (Okla. Crim. App. 2001) (holding the mere consumption of alcohol and marijuana insufficient to raise defense without showing consumption prevented defendant from forming intent); *Bland v. State*, 4 P.3d at 718 (upholding refusal to give instruction because defendant gave detailed account of the circumstances of the crime).

In this case, the trial court's failure to give a voluntary intoxication instruction did not render Petitioner's trial fundamentally unfair.  As found by the OCCA, Petitioner's own testimony reflects that she was not intoxicated to the extent that she could not form the requisite intent to commit murder.  In addition, as previously discussed in

40

connection with Ground One, several witnesses testified concerning Petitioner's alcohol habits and her tolerance for alcohol.   On direct examination Petitioner testified that she had a "couple" of beers on the day Tina was killed and that she was not drunk. Trial Tr. vol. 16 at 146; *see also* Trial Tr. vol. 17 at 8.   On cross-examination, Petitioner recalled extensive details of the events up to and immediately following the fight with Tina, including that she struck Tina four times.   Trial Tr. vol 16 at 239.     Additionally, Petitioner testified on cross-examination that she "wasn't drunk," that she had not had any marijuana that day and she did not think that alcohol or drugs played a part in the beating death of Tina.  Trial Tr. vol. 16 at 239-241.

Moreover, the jury was instructed that the State had the burden of proving specific intent beyond a reasonable doubt, that is Petitioner could be convicted of first-degree murder only if the jury found beyond a reasonable doubt that she acted with malice aforethought.[18]   O.R. vol. 3 at 501-503 (Instruction Nos. 20-22).   Certainly, the instructions given allowed the jury to properly evaluate Petitioner's intent in light of her admitted consumption of alcohol.

Thus, the record reflects that Petitioner's trial was not rendered fundamentally unfair by the omission of a jury instruction on voluntary intoxication.  Accordingly, no

---

[18]The trial court provided the following definition of malice aforethought:

'Malice aforethought' means a deliberate intention to take away the life of a human being. As used in these instructions, "malice aforethought" does not mean hatred, spite or ill-will. The deliberate intent to take a human life must be formed before the act and must exist at the time a homicidal act is committed. No particular length of time is required for formation of this deliberate intent. The intent may have been formed instantly before the commission of the act.

O.R. vol. 3 at 502 (Instruction No. 21).

due process deprivation occurred as a result of the absence of a jury instruction on voluntary intoxication, and Petitioner has not demonstrated that she was prejudiced by the trial court refusal to give such an instruction.  Because the OCCA's decision was not contrary to, or an unreasonable application of, prevailing Supreme Court jurisprudence, Petitioner is not entitled to habeas relief on her claim in Ground Nine.

## Ground Ten - Cumulative Error

As in her direct appeal, Petitioner contends that the "accumulation of error" in her case deprived her of due process of law.   Petition at 3; Petition, attached Brief of Appellant at 50.   "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003). "The point of a cumulative error analysis is to examine all the actual errors which are *individually* harmless to determine if together they render the defendant's trial unfair."  *Hamilton v. Mullin*, 436 F.3d 1181, 1196 (10th Cir. 2006) (emphasis in original) (citing *Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003) for explanation that "to deny cumulative-error consideration of claims unless they have first satisfied their individual substantive standards for actionable prejudice would render the cumulative error inquiry meaningless, since it would be predicated only upon individual error already requiring reversal")).

As discussed *supra*, on direct appeal the OCCA found error with respect to portions of five of the nine substantive claims raised by Petitioner.  Record, Ex. 3.  Those

claims included trial court evidentiary rulings that admitted (a) certain improper character evidence; (b) certain repetitive and cumulative gruesome photographs; (c) improper bolstering of jailhouse informant Fennell's testimony; (d) certain portions of Charles Hargrove's prior inconsistent statements; and (e) the statements Petitioner made during custodial interrogation.  In considering Petitioner's cumulative error argument the OCCA stated:

> We have found several errors in this case, none of which alone require reversal.  Viewed together, however, the overall effect on the fairness of [Petitioner's] trial is a much closer call.  After careful consideration, however, we decline to grant relief.

Response, Ex. 3 at 21.  The Court found that reversal was not required and affirmed Petitioner's conviction and sentence.  *Id.*[19]

Although the OCCA did not explain in detail the basis for its ruling, the Court's language – that it had considered "the overall effect" of the various errors in Petitioner's trial – indicates that it considered in the aggregate the prejudicial effect of the individual errors.  *See Miller v. Mullin*, 354 F.3d 1288, 1301 (10th Cir. 2004) (applying the deferential AEDPA standard to the OCCA's determination that "individual and aggregate effects" of the five errors were harmless error), *cert. denied*, 543 U.S. 1154 (2005).  Therefore, this Court defers to the OCCA's ruling "unless it constitutes an unreasonable application of the cumulative-error doctrine."  *Thornburg*, 486 F.3d at 1196.

_____

[19]Judge Chapel dissented on the issue of cumulative error, stating that while he "agree[d] that some of the errors were not, individually, serious enough to justify reversal" he could not agree that collectively the errors did not require "some form of relief."   Judge Chapel did not recommend that Petitioner's conviction be reversed but cautioned that a "fail[ure] to correct errors, when we 'know' the defendant is guilty and deserving of punishment . . . send[s] the wrong message to prosecutors and trial judges." Response, Ex. 3.

As found by the OCCA and as previously discussed in connection with Petitioner's first and sixth grounds for relief, notwithstanding the improperly admitted character evidence and the statements Petitioner made to OSBI officials, there was strong evidence properly admitted at trial, both direct and circumstantial, that Petitioner deliberately and intentionally killed Tina Hargrove. Additionally, a review of the claims involving state law evidentiary errors in Grounds One, Two, Four, Five and Six in light of the entire record has resulted in a finding by the undersigned that Petitioner's trial was not rendered so fundamentally unfair as to constitute a denial of her federal constitutional rights. The harmless error doctrine embodies the concept that the Constitution only requires that a defendant receive a fair trial, not a perfect one, and the "virtually inevitable presence of immaterial error" does not impair a jury's resolution of the central inquiry in every criminal trial: "the factual question of the defendant's guilt or innocence." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).

Here, Petitioner has failed to show that considered together, along with the entire record, the errors found by the OCCA to be harmless so infected the jury's deliberation that Petitioner was denied a fundamentally fair trial. *See Miller v. Mullin*, 354 F.3d 1288, 1301 (10th Cir. 2004), *cert. denied,* 543 U.S. 1154 (2005)(holding that the OCCA's finding of five errors and determination that the individual and aggregate effects were harmless was not contrary to or an unreasonable application of clearly established federal law). Petitioner's reliance on a dissent by one OCCA judge on direct appeal does not change this conclusion. *See Tillman v. Cook*, 215 F.3d 1116, 1133 (10th Cir. 2000) (rejecting petitioner's contention that his death penalty was barred by the Eighth Amendment

44

because three of five members of state supreme court voted either to reverse his capital murder conviction or to vacate his death sentence when individual justices of state supreme court dissented in different proceedings as to different issues, and majority of state supreme court affirmed conviction and sentence and denied post-conviction relief); *see also Nickleberry v. Booher*, No. 00-6226, 2000 WL 1763451, at *2 (10th Cir. Nov. 30, 2000)[20] (rejecting claims for habeas relief based on two state appellate judges dissent from the majority which affirmed his convictions on direct appeal).

Therefore, the undersigned finds that the OCCA's determination that the cumulative effect of the errors in Petitioner's trial did not warrant relief was not contrary to or an unreasonable application of federal law.   Accordingly, Petitioner is not entitled to habeas relief on the basis of cumulative error.

## **RECOMMENDATION**

For these reasons, it is the recommendation of the undersigned Magistrate Judge that the petition for writ of habeas corpus be denied.  Petitioner is advised of his right to file an objection to this Report and Recommendation with the Clerk of this Court by the 8th day of June, 2006, in accordance with 28 U.S.C. § 636 and Local Civil Rule 72.1. Petitioner is further advised that failure to make timely objection to this Report and Recommendation waives his right to appellate review of both factual and legal issues contained herein. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).  This Report and

---

[20]This unpublished decision is cited as persuasive authority pursuant to Tenth Circuit Rule 36.3.

Recommendation disposes of the issues referred to the undersigned Magistrate Judge in the captioned matter.

    ENTERED this 19th day of May, 2006.

BANA ROBERTS
UNITED STATES MAGISTRATE JUDGE